AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
NOV 0 1 2019

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Doppio Cellular Phone
IMEI: 359547080871905
Model Number U450

Case No. 19MJ4852

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Methamphetamine |

The application is based on these facts:

See attached affidavit of HSI Special Agent Cole Evans

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Cole Evans, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/1/19

*Judge's signature*

City and state: San Diego, California

Hon. Barbara L. Major, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Cole Evans, Special Agent with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) being duly sworn, depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant in furtherance of a narcotics smuggling investigation conducted by HSI Special Agents for the following target property:

   a. Doppio Cellular Phone
      IMEI: 359547080871905
      Model Number U450
      (**Target Device 1**)

   b. LG Stylo 4 Phone
      IMEI: 352439101643702
      (**Target Device 2**)

   (collectively, the **Target Devices**)

2. The **Target Devices** were seized on October 3, 2019, from Jorge ALVARADO, at the San Ysidro Port of Entry (POE), San Diego, California when he entered the United States from Mexico. It is believed that the **Target Devices** were used by ALVARADO to communicate with co-conspirators during a drug smuggling event on October 3, 2019. On that date, ALVARADO was arrested after driving his vehicle that was found to have approximately 19.54 kilograms (43.08 pounds) of methamphetamine concealed within the stakes of the vehicle's flat-bed frame. The **Target Devices** are currently in the possession of HSI San Ysidro Office, 2255 Niels Bohr Court, San Diego, California 92154, located within the Southern District of California.

1

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachments B1 and B2.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## TRAINING AND EXPERIENCE

5. I am a Special Agent with Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since October 2017. I have successfully completed the Criminal Investigator Training Program (CITP) and the Homeland Security Investigations Special Agent Training (HSISAT) Program at the Federal Law Enforcement Training Center (FLETC). I have training and experience in multiple investigative areas, and I have been cross-designated by the Drug Enforcement Administration to conduct investigations and make arrests based on violations of Title 21, United States Code. I am presently assigned to a Contraband Smuggling Group in San Ysidro, California, and my duties include investigating the illicit movement of controlled substances into the United States. Prior to my employment as a Special Agent, I was a Naval Explosive Ordnance Disposal (EOD) Officer and Platoon Commander. I hold a Bachelor's of Science degree in Mathematics from the United States Naval Academy.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing electronic devices to

maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use electronic devices, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from electronic devices. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

7. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in controlled substance smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug smugglers will use electronic devices because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug smugglers will use electronic devices because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug smugglers and their accomplices will use electronic devices because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug smugglers will use electronic devices to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Drug smugglers will use electronic devices to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

3

      f.     Drug smugglers and their co-conspirators often use electronic devices to communicate with load drivers who transport their narcotics and/or drug proceeds.

      g.     The use of electronic devices by drug smugglers tends to generate evidence that is stored on the electronic devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

8.     Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

9.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that electronic devices often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the electronic device. Specifically, I have learned, based upon my training, education, and experience that searches of electronic devices associated with narcotics smuggling investigations yield evidence:

      a.     tending to identify attempts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

      b.     tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the electronic device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10. On October 3, 2019, at approximately 5:23 p.m., a Customs and Border Protection Officer (CBPO) encountered ALVARADO while performing duties at the San Ysidro Port of Entry vehicle primary lane 25. ALVARADO was the driver and sole occupant of a white Chevrolet stake bed truck bearing California tag 7T48295 (the Vehicle). Upon entering ALVARADO's information into the computer system, the CBPO received a computer-generated alert. The CBPO received two negative customs declarations from ALVARADO and referred the Vehicle to secondary inspection for further investigation.

11. On October 3, 2019, a Border Patrol Agent (BPA) was assigned to assist with CBPO Field Operations at the San Ysidro Port of Entry. While the Vehicle was parked in the secondary lot, the BPA observed that the Vehicle resembled two similar stake bed trucks that were recently used in smuggling events. The BPA inspected the frames of the vehicle's stake bed and observed silicon holding caps at the base of the frames. The BPA pushed the silicon cap into the frame and observed a bundle concealed in the frame's cavity. The BPA then inspected the vehicle with his assigned Narcotics and Human Detection Dog (NHDD), and the NHDD alerted to the trained odor of narcotics at the vehicle's framed area of the stake bed.

12. At approximately 6:27 p.m., a CBPO conducted a screening of the vehicle with another assigned NHDD while the vehicle was parked in the secondary lot. The NHDD alerted to a trained odor of narcotics at the framed area of the vehicle's stake bed. Following the NHDD screenings, a CBPO conducted a seven-point inspection of the vehicle. The CBPO discovered thirty-six packages concealed within the stakes of the vehicle's flat-bed frame. The thirty-six packages contained a white crystalline substance that field-tested positive for the properties of methamphetamine. The total weight of the methamphetamine amounted to 19.54 kilograms.

13. A CBP Officer placed ALVARADO under arrest. At the time of arrest, ALVARADO was in possession of the **Target Devices**. CBP assumed custody of the **Target Devices**.

14. Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe that the Defendant likely used the **Target Devices** to coordinate the importation of federally controlled substances into the United States. In addition, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information may be stored in the memory of the **Target Devices** which may identify other persons involved in narcotics trafficking activities. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of the Defendant, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, and other digital information, may be stored in the memory of the **Target Devices**.

15. Finally, I also have learned that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. In my professional training, education and experience, I have learned that this requires planning and coordination in the

days, weeks, and often months prior to the event. Given this, I request permission to search the **Target Devices** for items listed in Attachments B1 and B2 beginning on August 3, 2019, up to and including October 3, 2019.

## SEARCH METHODOLOGY

16.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

17.     Following the issuance of this warrant, I will collect the subject cellular telephones and subject them to analysis. All forensic analysis of the data contained within

the telephones and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

18. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

19. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

### CONCLUSION

20. Based on all of the facts and circumstances described above, there is probable cause to conclude that ALVARADO used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

21. Because the **Target Devices** were promptly seized during the investigation of ALVARADO's smuggling activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by ALVARADO continues to exist on the **Target Devices**. As stated above, I believe that the date range for this search is from August 3, 2019, up to and including October 3, 2019.

//
//
//
//
//
//

22. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item(s) described in Attachment A and seize the items listed in Attachments B1 and B2 using the above-described methodology.

_____
COLE EVANS
HSI Special Agent

Subscribed and sworn to before me this 1st day of Nov, 2019.

_____
HON. BARBARA L. MAJOR
United States Magistrate Judge